**GROSECLOSE et al. v. JOHNSTON et al.**

No. 9471.

Court of Civil Appeals of Texas. Austin.

Nov. 29, 1944.

Rehearing Denied Dec. 20, 1944.

W. S. Leslie, of San Angelo, for appellants.

Clyde Vinson, of San Angelo, for appellees.

BLAIR, Justice.

Mrs. Ida Edwards died January 28, 1943, leaving as surviving children and heirs appellant, Mrs. Emma Groseclose, and appellees, Mrs. Helen Johnston, Mrs. Mary Houston, Mrs. Goldie Davis, and Dan, Fred and Eddie Edwards, and Tommy Edwards, Jr., a grandson. Appellees brought this suit against appellant to set aside a general warranty deed, executed by the mother to appellant on August 30, 1940, conveying Lots 13 and 14, in Block 12 of Miles Addition in San Angelo, Texas. Three grounds were alleged for setting aside the deed: (1) that grantor was of unsound mind when she executed it; (2) that it was executed through the undue influence of appellant upon grantor; and (3) that grantor intended by the deed to convey the property to appellant in trust for grantor.

The jury found the first two grounds against appellees; but that grantor intended by the deed to convey the property to appellant in trust for grantor. Upon the last finding the judgment set the deed aside, vested the title in appellants and appellees as the heirs of the deceased grantor, and appointed a receiver to sell the property.

We sustain the contention of appellant that the trial court erred in submitting to the jury the issue as to whether the property was conveyed in trust for the benefit of the grantor, and in refusing to disregard its finding that it was so conveyed; and in refusing to render judgment for appellant for the title and possession of the property under the deed. The rule applicable is succinctly stated and quoted in 42 Tex.Jur., 687, 688, Sec. 76, as follows:

"It has been said many times that to overcome the presumption that an apparent owner of property is the true owner

the evidence must be clear, satisfactory and convincing. If the evidence tendered is equally susceptible of a conclusion that the property is held otherwise, it is insufficient to show a trust. To quote the Supreme Court, 'Perhaps there is no fact which, in the trial of civil causes, is required to be so satisfactorily proved as that which engrafts a parol trust upon the legal title. * * * Whilst it is not necessary that it should be established beyond a reasonable doubt, nothing must be left to conjecture, nor must presumptions be indulged which are not the usual and almost necessary deductions from the facts proved.'

"Again, it has been said that

" 'The principle involved is one of the first importance to the stability and certainty of titles, and it is a principle which it is the duty of the court to enforce by granting new trials, where it has been disregarded by juries.' "

The facts relating to the mental capacity of grantor and the alleged undue influence to obtain the deed need not be discussed, because the jury found these issues against appellees, and as to which findings no question is raised here. On the trust issue the court enforced the provision of Art. 3716, Vernon's Ann.Civ.St., inhibiting testimony by the parties to the suit of transactions with the deceased. The evidence relating to the claim that the deed was intended to convey the property in trust to appellant for the use and benefit of grantor will be stated in substance.

The two lots were purchased with the separate funds of Mrs. Ida Edwards, and deeded to her as her separate property in 1926. Shortly thereafter a house was purchased and moved on the lots, and other improvements were made. From that time the property was used as the homestead of Mrs. Edwards and her husband, J. A. Edwards, who was a government trapper and away from home most of the time, until his death in 1934; and Mrs. Edwards continued to use the property as her home, where she died in January, 1943. From about the time the property was acquired by Mrs. Edwards until shortly prior to her death, appellant and her daughter made their home with Mrs. Edwards. Appellant was a widow, and was then Mrs. Emma B. Seals, and her child was Dorothy Seals, now Mrs. Dorothy Patterson, wife of Vernon Patterson. The deed was executed by Ida

E. Edwards to Emma B. Seals. Shortly before the death of Mrs. Edwards appellant married H. C. Groseclose.

The deed was executed August 30, 1940, and filed for record August 31, 1940, recited a consideration of $1 cash, and contained a general warranty clause. Oscar Frink, the attorney who prepared the deed, testified that appellant requested him to prepare the deed, and as to the consideration for it testified as follows:

"My impression is that there were back taxes against the property, and she (Mrs. Groseclose) had to help sustain her mother and in sustaining her mother during the years, and keeping her up there at the home; that is just my impression; I could be wrong about that; I have that impression—that her mother was going to deed her this property."

Mrs. Emma Davis, a neighbor, testified that Mrs. Edwards visited her and told her that Emma (appellant) had been sick and that "she gave the deed to pacify her," because Emma was fearful she would be without a home for herself and daughter, who was graduating from high school. Witness further testified that later Mrs. Edwards was visiting her and "she was talking about the taxes on the place, and she said she asked her daughter for the deed back and she refused to give it back to her." Witness also testified that Mrs. Edwards told her that she depended on Mary and her pension for support.

The Tax Collector of the city of San Angelo testified that for the years 1927 to 1937 appellant (Emma) paid the taxes, but that the property stood in the name of Mrs. Edwards on the tax rolls; and that the taxes were delinquent since 1937.

Appellee Dan Edwards came with his wife and seven children to the home in July, 1941, because he could not find a place to rent, and remained there until the death of Mrs. Edwards. The children were noisy and worried Mrs. Edwards, who was then about 72 years of age, and she went to a farm and lived with her daughter Mary for about a year and until about one month prior to her death, when she returned to her home. Prior to going to the farm Dan and another son became intoxicated and fought through the house and into the yard, which greatly disturbed Mrs. Edwards. Because of this disturbance appellant (Emma) and her daughter, who was then Mrs. Vernon Patterson,

moved out of the home and did not return until after the death of Mrs. Edwards. After appellant and her daughter moved out Mrs. Edwards wrote a letter, dated November 5, 1941, to her children living at Odessa, as follows:

"Dearest ones in Odessa:

"Will write you a few lines to tell you the news Emma and Dorothy moved out Vernon rented them a house  An Emma lied to me and said if I would make a deed to this place she would pay the taxes and she didn't pay the taxes, and now the taxes is going to take the place and put me out of a home.  We are hav pretty weather now  Wish I could see you all Hope you are all well and happy

"With love and best wishes
"Mother."

Mrs. Dan Edwards, wife of Dan Edwards, who moved to the place with her family in July, 1941, testified to conversations between Mrs. Edwards and Emma (appellant) about the deed in question. The first conversation was shortly after Dan and witness moved to the place, and when Mrs. Edwards was wanting Emma to give the deed back, and as follows:

"Q. State that conversation?  A. Emma told her, she said: 'Granny, you don't have to worry about things; I will keep the taxes paid upon it.'  She wanted her to give it back to her.  She said, 'No, I have a right to the deed,' and Granny cried because she wouldn't give it back to her; the deed to the place.

"Q. What else, if anything, did Mrs. Seals, now Mrs. Groseclose, say to her? A. She told her not to worry about the place; that whenever they sold the place she'd divide the place equally among the children."

The other conversation was as follows:

"Q. Would you state what time you heard that conversation?  The other conversation.  A. I don't recall exactly when, but Granny got the keys to Emma's trunk and she went in the trunk and she got those papers, and she was going to Mary's and get the place back in her name, but she didn't; then she told me she was going to burn them; burn the papers, and so when Mary came in from work I told Mary about that Granny had the papers to the place, and she was going to burn them; she had told me she was.  Mary said: 'You'd better go tell Emma about it,' and when Emma came from work I told her

Granny had the papers on the place and she had told me she was going to burn them, and so Granny—Emma then tried to get the papers from her by coaxing and telling her she wanted the papers back, trying to get them, but Granny wouldn't give them to her because she had taken them and hid them, so Emma told her, she says, 'Granny, if you don't give me the papers on the place I can't pay the taxes; I would have to have those papers to pay the taxes.' Granny told her, she says:  'You haven't paid the taxes anyway; they are going to take the place from you and we are going to be out in the street.'  Finally Granny—

"Q. Mrs. Seals—had anything else been stated prior to Granny about the deed? A. Well, she just told her she had to have them to pay the taxes; if she would give her these papers back she would pay the taxes on it; that when she sold it she would divide it with the children."

Witness further testified that Emma had helped her and her husband from time to time in supporting their children, and in paying house rent for them.

Mrs. Goldie Davis, one of the appellees called by appellant under the adverse witness rule, testified that Emma (appellant) supported their mother, mostly; that she took care of the house and the bills for utilities; paid the taxes from 1926 to the time payment was stopped in 1937; paid the insurance on and kept up the place. Witness testified to one conversation with her mother concerning the deed, as follows:

"Q. What did she tell you? A. She said she had rather Emma have it because Emma, of all these heirs, had been the— you might say, the Godmother of the whole place, and in keeping it up and of mama—

"Q. She had been taking care of and supporting your mother? A. She had been taking care of them?

"Q. What do you mean when you say she (Emma Seals) had been the Godmother to the whole place? A. I mean she has helped the whole family is what I mean; helped all of them, all of my brothers, maybe except one; that is Fred; he has always made his own and paid some debts.

"Q. Did that continue over a period of years? A. Yes, it has been quite a few years.

"Q. At any other time did she say anything about wanting to deed it to Emma because Bert Houston (a son-in-law)

wanted to do something about it? A. Yes, she did.

"Q. Will you tell the jury what it was? A. She told me, the only time she ever talked to me about that, that she was afraid Bert Houston, and my sister, Mary, would trade the place off some way and she wouldn't have a home."

This witness stated that she was not claiming any interest as against Emma (appellant) in the property.

After this suit was filed appellant and her husband, H. C. Groseclose, whom she married a few days prior to the death of her mother, went out to the farm of Mary and her husband, Bert Houston, who testified that Emma wanted to know if they joined in the suit against her; and that a heated argument occurred between Emma and his wife; after which witness testified as follows:

"My wife asked her: 'Emma, why don't you go on and sell the property and divide it up like it was supposed to be, and we will avoid all these hard feelings and things, and it will be like Granny wanted it.'"

To which appellant replied:

"Mrs. Seals told my wife: 'Well, I had intended to do that; I had intended to sell the property and divide it among the heirs, but'—and I think this is her exact words now: 'They've acted like they have and I've got it and I'm going to keep it all.'"

Mrs. Mary Houston, the wife, testified to the same effect as to this conversation with her sister Emma.

Mrs. Dorothy Patterson, daughter of appellant, testified that she moved to the home of her grandmother when five years of age and lived there until she married at 22 years of age, and continued to live there while her husband was away in the Army until the day following the fight between Uncle Dan and his brother, which greatly disturbed her grandmother; that her grandfather never contributed anything to the support of her grandmother; that her mother (appellant) alone supported her grandmother, paid the taxes, insurance and upkeep of the home. She testified that she heard her Aunt Mary (Mrs. Houston) and her grandmother talking about deeding the place to her mother, and as follows:

"Q. What did she say about it? A. She had talked about grandmother deeding the place to my mother and said she thought she should have it because mother had worked and kept grandmother up.

"Q. What did Mrs. Edwards tell you about having deeded the property to your mother? A. She had said she wanted mother to have the property because she had worked and supported her and kept the place up and paid the taxes and she wouldn't have had that if mother hadn't paid the taxes."

The contention of appellees who sought to impose the trust upon the deed absolute on its face, is that the foregoing evidence overcame the presumption that the deed is what it purports to be on its face, and showed by clear, satisfactory, and convincing proof that the property should be held in trust by the grantee for and to be divided between all of the children of the grantor after her death, and that such evidence supported the jury finding from a preponderance of the evidence that grantor so intended by the deed.

Appellees further contend that the foregoing facts relating to the deed were admissible under the exception to the general rule that declarations made by the grantor subsequent to the execution of a deed are never admissible to show that a deed absolute on its face was intended to convey the property in trust, except when such subsequent declarations are made in the presence of the grantee; and except under the exception that subsequent declarations made by the alleged trustee showed a recognition of the trust; and that the confidential relationship by grantor to the grantee by family connection may be considered in determining the sufficiency of the evidence to establish the trust.

■ The rules of evidence cited by appellees are not in dispute. Some of the foregoing declarations of grantor, however, were not made in the presence of grantee and do not come within the exceptions stated. The declarations made by the grantor in the presence of the grantee subsequent to the execution of the deed were not of such clear, satisfactory, or convincing quality as to overcome the presumption that the deed absolute on its face was intended to create a trust for the benefit of appellees for an equal division between them and appellant of the property conveyed. The only subsequent declarations of grantor testified to were to the effect that she deeded the

property to grantee under a promise that she would pay the taxes, which she had not paid, and grantor was fearful the property would be sold for taxes, and she and grantee would not have a home or place to live, and grantor asked for the deed back. There was no testimony that the grantor ever made any declaration in the presence of grantee that the property was intended to be held by her in trust to be equally divided between appellees and appellant after the death of grantor. The only concern expressed by grantor was fear that the property would be sold for taxes, and no statement was ever shown to have been made by grantor that she conveyed the property in trust to be divided between all of her children after her death.

It is true in this connection that Mrs. Dan Edwards testified that in the effort to pacify grantor's fear that the property would be sold for taxes, grantee promised to pay them, with the added statement that grantee would divide the property equally between all the children when she sold it. Grantee could not refute this testimony because Art. 3716 inhibited her from testifying as to transactions with the deceased grantor in this suit by the heirs of grantor. A statement was also attributed by Mrs. Houston to appellant, made after this suit was filed, to the effect that if this suit had not been filed she might or would have divided the property, but since the suit was filed she had a deed to it and she would keep it. These statements or declarations were not those of the grantor, but of the grantee, or of the witnesses testifying to them. They were apparently admitted under the exception to the general rule that subsequent statements or declarations of the alleged trustee showing a recognition of the trust, are admissible to show the trust. But these statements and declarations, if considered as such, are not sufficient to establish the alleged trust under the rule that the evidence to establish such a trust must be clear, satisfactory and convincing.

The testimony was not contradicted that appellant, the grantee in the deed, paid the taxes on the property from 1927 to 1937, paid the insurance premiums and upkeep on the property, and contributed most of the support of grantor for a long number of years prior to the execution of the deed. In view of these facts, it would have been manifestly unreasonable for grantor to require grantee to divide the property equally between all of grantor's children after her death. Furthermore, the only positive testimony in the record was that of Mrs. Goldie Davis, a plaintiff called as an adverse witness, who testified that her mother intended by the deed to give the property to appellant because of the aforementioned payments of taxes, insurance and upkeep and care of grantor for a long number of years. To attribute to the foregoing statements of grantee a recognition of such trust estate under the deed would be a mere speculation or conjecture, and would violate the rule first above quoted, that "to engraft a parol trust upon the legal title * * * nothing must be left to conjecture, nor must presumptions be indulged which are not the usual and almost necessary deductions from the facts proved." See also 42 Tex.Jur., 691, § 78, and cases there cited. Briscoe v. Bright, Tex.Com.App., 232 S.W. 1082.

The judgment of the trial court is reversed and judgment is here rendered for appellant for title and possession of the property under the deed.

Reversed and rendered.